NOTICE
Decision filed 01/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220532-U

NO. 5-22-0532

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 21-CF-385 |
| | ) | |
| ALEXSIS J. GARCIA, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's challenges asserting that the State failed to lay an adequate chain of custody for admission of narcotics evidence and that the State violated his due process rights regarding discovery were forfeited; the trial court's rulings that the State did not commit a discovery violation and that the trial court did not err in sentencing the defendant were not an abuse of discretion.

¶ 2    The defendant, Alexsis J. Garcia, was charged by supplemental information on January 12, 2022, with one count[1] of possession of methamphetamine in violation of section 60(a) of the Methamphetamine Control and Community Protection Act (720 ILCS 646/60(a) (West 2020)), for possessing less than five grams of a substance containing methamphetamine. A jury trial was conducted on April 12, 2022, and the defendant was found guilty. On June 2, 2022, the defendant

_____

[1]The defendant was charged by the same supplemental information with additional charges which were severed by the trial court at the request of the defendant. The additional charges are not at issue here.

1

was sentenced to 9 years' incarceration in the Illinois Department of Corrections (IDOC) and 12 months of mandatory supervised release (MSR).

¶ 3    The defendant now appeals his conviction and sentence arguing that the State failed to lay an adequate foundation for the admission of narcotics evidence; that the State violated his due process rights and committed a discovery violation regarding his statements to police; and, that his sentence was excessive. For the following reasons, we affirm the defendant's conviction and sentence.

¶ 4                                     I. BACKGROUND

¶ 5    On December 19, 2021, officers with the Mt. Vernon Police Department arrested the defendant in an alley outside of a bar as part of an ongoing investigation. The arresting officers searched both the defendant and his backpack with negative results, and then placed him in the back of a squad car. While in the squad car, the defendant told the officers that he had methamphetamine in his pocket. The officers removed the defendant from the car and recovered a small, wadded-up piece of paper from the defendant's hand that contained less than 0.1 gram of methamphetamine. The State charged the defendant with possession of less than five grams of methamphetamine.

¶ 6                                     A. Jury Trial

¶ 7    The defendant's jury trial was held on April 12, 2022. Corporal Travis Pendley of the Mt. Vernon Police Department testified that on December 19, 2021, he was attempting to locate and arrest the defendant based on an ongoing investigation. The officers received information that the defendant was at the Corner Tavern at the corner of Perkins and 19th Streets. Corporal Pendley proceeded to that location and made contact with the defendant in an alleyway between 18th and 19th Streets. Corporal Pendley testified that he arrested the defendant and searched his person

2

incident to arrest. As the defendant was being placed into a squad car, he stated that he was in possession of methamphetamine, which he voluntarily handed to Corporal Pendley. Corporal Pendley transferred the item the defendant handed him to Officer Volz.

¶ 8    The State introduced People's exhibit No. 4 into evidence, which was a photograph of the folded-up piece of paper containing a crystal-like substance that Corporal Pendley received from the defendant, shown on a scale. Corporal Pendley testified that the photograph showed the evidence in the same condition as the night he received it. The exhibit was admitted without objection. On cross-examination, Corporal Pendley stated, to the best of his recollection, that the defendant used the word meth, not methamphetamine, when advising that he possessed the item. Corporal Pendley then testified that his squad car was equipped with cameras that have microphones. Corporal Pendley testified that, at the time the defendant stated that he had "meth," Corporal Pendley's squad car lights were not activated, so his camera system was not activated. Corporal Pendley explained that the camera system in the squad cars activate when the emergency lights are on, or when they "deem that it is necessary to have the recording system running." They also have microphone packs that are carried on their person which have a slide button to begin recording manually. He was not sure whether Officer Chamness's vehicle had its recording device activated, which was the squad car the defendant was actually placed into upon his arrest. Corporal Pendley stated that he did not have a body camera, nor did the other officers with the Mt. Vernon Police Department.

¶ 9    Next, Officer Dillan Chamness testified that he was employed as a patrol officer with the Mt. Vernon Police Department. Officer Chamness testified that he, along with Corporal Pendley, arrested the defendant on December 19, 2021, pursuant to a prior investigation. Officer Chamness stated that he had searched the defendant and did not find any contraband. When the defendant

3

was placed in Officer Chamness's squad car, the defendant told the officers that he had methamphetamine in his pocket, and the defendant handed an item to Corporal Pendley. Officer Chamness was questioned about whether his audio recording system was going at the time the defendant was placed into the squad car. Officer Chamness testified that his recording system should have been on, as "anytime we place someone in the vehicle, we always start a recording. So we listen to—we can recall anything they say or anything like that, if they're moving around, stashing in the vehicle, anything."

¶ 10 On cross-examination, Officer Chamness indicated that the officers present when the defendant stated that he had contraband were Corporal Pendley, Officer Volz, and himself. He testified that the wording he recalled the defendant use was that "he had dope on him." Officer Chamness testified that the audio recording in the vehicle should have been on when the defendant made the statement. When asked directly if it *was* on, Officer Chamness stated, "I can't recall exactly, but yeah, it should have been on. I don't know why in the world it—I wouldn't have turned it on. I always do." Officer Chamness described the squad car assigned to him as having a video recording device in the car with microphones that can be started by the officer at any time. There were also microphones in the vehicle that record audio. The officer has to turn on both microphone systems to record audio. When asked if he was aware that the system had made any recording of the defendant's statement, Officer Chamness stated, "I'm not aware if it did. I didn't go back and record—or review the system—or review the audio or video that was taken at that time."

¶ 11 Next, Officer Cory Volz testified that he was an officer with the Mt. Vernon Police Department. On December 19, 2021, he was on duty and arrived at the location of the defendant's arrest after he was already in custody. The defendant was in the back of Officer Chamness's squad car when Officer Volz arrived. Corporal Pendley provided Officer Volz a wadded-up piece of

4

paper that contained suspected methamphetamine. Officer Volz testified that the item was a wadded-up piece of paper with a white, crystal-like substance inside that he believed, based on his training and experience, to be methamphetamine. Once Officer Volz returned to the Mt. Vernon Police Department, he photographed and weighed the evidence, packaged it in an envelope, and placed it into the temporary evidence lockers. The evidence weighed 0.1 grams. Officer Volz then looked at People's exhibit No. 1, which he identified as the same envelope that he had packaged the evidence into. Officer Volz identified the handwriting on the front of the envelope as his, as well as his name on the package, and noted that the envelope appeared to be in substantially the same condition as when he first packaged it. The top part of the envelope contained information that Officer Volz filled out and the bottom part had a chain of custody. Officer Volz locked the evidence into an evidence locker, which was the last he saw it. On cross-examination, Officer Volz testified that he believed that Officer Chamness's squad car was equipped with audio recording capability.

¶ 12    The parties agreed to the trial court reading a stipulation to the jury, indicating that if Officer Ray Gilbert were to testify, he would state that he was employed as an officer with the Mt. Vernon Police Department on December 19, 2021. As part of his duties, Officer Gilbert takes custody of evidence provided by law enforcement and physically transports the evidence to the Illinois State Police Laboratory for analysis. On January 13, 2022, Officer Gilbert transported the suspected methamphetamine to the Illinois State Police Metro-East Forensic Laboratory (crime laboratory) for analysis and relinquished custody to Michelle Elliott, evidence custodian at the crime laboratory. Officer Gilbert maintained secure possession of the evidence until its transfer.

¶ 13    Kristine Dillow-Benak testified that she was employed by the Illinois State Police at their crime laboratory as a forensic scientist. In that role, she would receive evidence from agencies and

analyze the evidence for the presence of controlled substances. Dillow-Benak was qualified to testify as an expert in the field of forensic science, specifically drug chemistry. Dillow-Benak testified that she recognized People's exhibit No. 1 as an evidence envelope containing her initials where she took custody, and also when she finished the case and resealed the envelope. She explained that the sticker contains the laboratory's case number and item number that they assigned it. Across her seals, she dates and initials and puts the case number and item number again. Dillow-Benak testified that an evidence technician that works at the crime laboratory will receive the evidence from the agency, then it is put into a vault in the drug chemistry section where she would access it.

¶ 14     Dillow-Benak stated that she had obtained the envelope in question on January 21, 2022, from the evidence vault. When she received the envelope, it was sealed. Dillow-Benak opened the envelope and wrote a description of the contents upon receipt. When resealing the evidence, she placed the crystalline substance into a small Ziploc bag and the white crumpled paper in its own Ziploc bag. The two new bags were placed into a larger Ziploc bag, heat sealed, and marked and placed into the original evidence bag. The original evidence bag is then heat sealed and marked as well. While testifying, Dillow-Benak opened the outer envelope of People's exhibit No. 1 and retrieved the inner Ziploc bag. She testified that her markings were across the top of the Ziploc bag and that it was substantially in the same condition as when she went through the process of testing it and placed it back in the bag. People's exhibit No. 1 was admitted without objection.

¶ 15     Dillow-Benak went on to describe that when she received the sample, she weighed it, and it weighed 0.1 grams. Dillow-Benak next described the chemical testing, explaining that she had conducted two color tests with reagents that were made in house and tested against a known standard for accuracy. She indicated that, because both the agency's report as well as her own

experience and training led her to believe that the substance may be methamphetamine, she used the chemicals marquis and sodium nitroprusside. Both substances react with methamphetamine to produce specific colors, orange and blue, respectively. The tests, considered together, indicated that the substance was methamphetamine. She next conducted a gas chromatography mass spectrometry analysis which also indicated that the substance tested was methamphetamine. Dillow-Benak then generated a report indicating the laboratory case number for the evidence and the results, which was admitted as People's exhibit No. 3, without objection. Dillow-Benak testified that the tests she conducted were generally accepted in the scientific community and that based on her education, training, and experience in drug chemistry, and the tests performed, she believed within a reasonable degree of scientific certainty that the substance she tested was less than 0.1 gram of methamphetamine.

¶ 16 After the State rested its case, defense counsel moved to suppress the defendant's statement made in Officer Chamness's squad car regarding his possession of methamphetamine. Defense counsel argued that the State should be sanctioned for a discovery violation, where Officer Chamness testified that his squad car is equipped with a recording device that should have been working and that he always turns on. As the State's discovery response did not include any audio recording of the defendant's statements made in the squad car, defense counsel requested that their testimony regarding the statements be stricken. The trial court denied the defendant's motion, finding that there was no evidence that there *was* a recording, only testimony that there *should have been*. Defense counsel moved for a directed verdict, which was denied, and rested the defendant's case. The jury returned a verdict of guilty.

¶ 17 On April 18, 2022, the defendant filed a motion for a new trial and to vacate jury verdict. The motion argued, as relevant here, that the trial court erred in denying the defendant's motion to

7

suppress evidence of an audio recording of the defendant's statement that the State failed to produce during discovery.

¶ 18    At the beginning of the sentence hearing on June 2, 2022, the trial court heard arguments on the defendant's motion for new trial and to vacate the jury verdict and denied the same. The case then proceeded to a sentencing hearing.

¶ 19    The parties agreed that the defendant was eligible for extended term sentencing based on his prior criminal history, making the defendant's sentencing range from 2 to 10 years' incarceration in IDOC, with an MSR period of 12 months. The trial court considered the modified presentence investigation report (PSI) without objection. The State introduced People's exhibit No. 4, which was a report prepared for a separate federal case for the defendant. Cindy Myers, a probation officer who prepared the defendant's PSI, testified about the same.

¶ 20    Officer Volz testified that on December 19, 2021, he had responded to a domestic violence incident at a residence in Mt. Vernon, Illinois. When he arrived, he found Amber Garcia, the defendant's wife, sitting on a couch with cuts on her lip/chin area, on her right thigh, and on her left middle finger. There was blood pooling beneath where she was sitting. She indicated that she had been attacked by the defendant. The State introduced photographs of Amber's injuries into evidence. When officers apprehended the defendant pursuant to the domestic violence investigation, he provided the methamphetamine that was the subject of this case. The defendant admitted, in mitigation, a letter from the Treatment Alternatives for Safe Communities (TASC) program about the defendant's need for inpatient substance abuse counseling. The defendant also introduced two personal reference letters.

¶ 21    The State pointed out the defendant's criminal history, including eight felonies committed by the defendant, and five sentences to IDOC. The State conceded that the defendant likely had a

problem with methamphetamine and had been using drugs from the age of nine years old. The defendant argued that he possessed a very small amount of methamphetamine and had grappled with substance abuse from childhood through the age of 46. The defendant argued that three factors applied in mitigation: (1) that the defendant's criminal conduct neither caused nor threatened serious physical harm to another, (2) that the defendant did not contemplate that his criminal conduct would cause or threaten serious harm to another, and (3) that the defendant was likely to comply with the terms of a period of probation. The defendant offered a statement in allocution.

¶ 22    The trial court stated that it considered the testimony of witnesses, exhibits, and the evidence at trial. In aggravation, the trial court considered the defendant's criminal history, commenting that he "has a very bad record, spanning many years." The trial court considered eight state felonies, two federal felonies, and the fact that the defendant had been incarcerated under both systems. The defendant had prior drug crimes and a felony involving firearms. The trial court found that the sentence was necessary to deter others from committing the same crime.

¶ 23    In mitigation, the trial court found that the defendant's criminal conduct neither caused nor threatened serious harm. Further, it found the defendant did not contemplate that his criminal conduct would cause or threaten physical harm to another. The trial court disagreed that the defendant was likely to comply with the terms of probation, noting that the defendant had not complied with state probation, parole, or federal supervised release. The trial court found that probation or conditional discharge would deprecate the seriousness of the conduct, and it would be inconsistent with the ends of justice, based largely on the defendant's criminal history. The trial court sentenced the defendant to 9 years' imprisonment, to be served with day-for-day credit to apply, with an MSR period not to exceed 12 months. The trial court found that the offense was

9

committed as a result of the use or abuse of alcohol or controlled substances and recommended rehabilitation services to be provided at IDOC.

¶ 24 The defendant filed a motion to reconsider sentence on June 3, 2022. The motion stated that the trial court erred in sentencing the defendant to nine years' imprisonment where (1) the trial court failed to properly apply the factors in aggravation and mitigation, (2) the trial court failed to recognize the defendant's potential for rehabilitation, and (3) the sentence was excessive and unreasonable in light of the evidence presented. A hearing was held on August 16, 2022, and the trial court denied the motion to reconsider sentence. This appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26 On appeal, the defendant raises three issues for this court's consideration. The defendant challenges his conviction and sentence, arguing that the State failed to lay an adequate foundation for the admission of narcotics evidence; that the State violated his due process rights and the discovery rules regarding the defendant's statements to police; and, that his sentence was excessive. For the following reasons, we affirm the defendant's conviction and sentence.

¶ 27                                 A. Chain of Custody

¶ 28 The first issue the defendant raises on appeal is whether the trial court erred by admitting the methamphetamine and positive laboratory result into evidence. The defendant argues that the State failed to lay a proper foundation. Specifically, the defendant argues that the State failed to establish a sufficient chain of custody for admission of the exhibits. The defendant's argument rests on People's exhibit No. 4, which is a photograph depicting a scale Officer Volz used to weigh the suspected methamphetamine, with a portion of the sample sitting directly on the scale's surface. The defendant describes the scale as "grimy and soiled," and argues that the State failed to show sufficient evidence to render it improbable that the original item had either been

10

exchanged, contaminated, or subjected to tampering. The defendant's argument assumes that the purported methamphetamine taken from the defendant could have been contaminated by the surface of the scale, where a portion of the evidence touched the surface. The State argues that the issue of the sufficiency of the evidence to form an adequate chain of custody for the narcotics has been forfeited by the defendant, where there was no objection to the admission of the exhibit, and the issue was not raised in his posttrial motion. See *People v. McCarter*, 385 Ill. App. 3d 919, 927 (2008) (generally, to preserve an error for appeal, a defendant must both object at trial and raise the issue in a posttrial motion). The defendant acknowledges that the issue was not preserved but asks this court to consider the issue under both prongs of the plain error doctrine.

¶ 29    A claim that the State presented an incomplete chain of custody is a challenge to the foundation of the evidence and is therefore subject to forfeiture. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 68. Application of forfeiture when a defendant did not object to the chain of custody is particularly appropriate because this failure to object deprives the State of its opportunity to cure any deficiency in the foundation. *Id.* ¶ 71. That said, in *People v. Woods*, 214 Ill. 2d 455 (2005), our supreme court explained that a defendant may raise a forfeited chain of custody issue for the first time on appeal if the alleged error rises to the level of plain error, such as "in those rare instances" where there is "a complete breakdown in the chain of custody," *i.e.*, there was *no* link between the substance recovered by the police and the substance tested. *Id.* at 471-72.

¶ 30    The plain error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237 Ill. 2d 1, 18 (2010). We will apply the plain error doctrine when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against

the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step of a plain error review is determining whether any error occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009).

¶ 31    The admission of evidence at trial lies solely within the discretion of the trial court, and we will not overturn its decision on that point absent an abuse of discretion. *Banks*, 2016 IL App (1st) 131009, ¶ 70. Such an abuse occurs only when the trial court's ruling with respect to admissibility is arbitrary, fanciful, or unreasonable such that no reasonable person would adopt the court's view. *Id.*

¶ 32    Prior to introducing an object into evidence, the State must lay an adequate foundation either through its identification by witnesses or through a chain of possession. *Woods*, 214 Ill. 2d at 466. The character of the object sought to be introduced into evidence determines the appropriate method of establishing a foundation. *Id.* When an item has readily identifiable and unique characteristics, and its composition is not easily changed, the State may lay an adequate foundation through testimony that the item sought to be admitted is the same as the item recovered and is in substantially the same condition as when it was recovered. *Id.* In cases involving controlled substances, by contrast, often the physical evidence is "not readily identifiable or may be susceptible to tampering, contamination or exchange." *Id.* at 467. The State, therefore, has the burden of establishing a chain of custody as the foundation for the admission of such evidence. *Id.* This requires the State to show that the police took reasonable protective measures to ensure the substance recovered from the defendant was the same substance tested by the forensic chemist. *Id.*

12

The State has the burden to establish a custody chain that is sufficiently complete to make it improbable that the evidence was subject to tampering, or accidental substitution. *Id.*

¶ 33     The State establishes a *prima facie* showing that the chain of custody for controlled substances is sufficient by meeting its burden to establish that reasonable protective measures were taken to ensure that the evidence has not been tampered with, substituted, or altered between the time of seizure and forensic testing. *Id.* at 468. After the State establishes a *prima facie* case, the burden then shifts to the defendant to produce evidence of actual tampering, alteration, or substitution. *Id.* Trial courts have properly admitted evidence where there was testimony which sufficiently described the condition of the evidence when delivered matched the description of the evidence when examined, despite a missing link in the chain of custody. *People v. Bynum*, 257 Ill. App. 3d 502, 510 (1994).

¶ 34     Once the State has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence. *Woods*, 214 Ill. 2d at 467. So long as the testimony describing the condition of the evidence when tested is consistent with the condition of the evidence when it was placed into the evidence vault, then the State has demonstrated that the police took reasonable protective measures to ensure that the evidence recovered from the defendant was the same evidence tested at the lab. *Id.*

¶ 35     The State met its *prima facie* burden here. The defendant does not argue that there was a missing link in the chain of custody and the testimony showed that the chain of custody was sufficiently complete to make it improbable that the narcotics had been subject to tampering or substitution. Thus, the burden shifted to the defendant to show actual evidence of tampering,

13

substitution, or contamination. See *People v. Alsup*, 241 Ill. 2d 266, 274-75 (2011). Here, the defendant wholly fails to do so.

¶ 36    The defendant's challenge to the sufficiency of the chain of custody is limited to the possibility that the substance was contaminated when it came into contact with a scale at the police department. In support, the defendant directs this court's attention to People's exhibit No. 4, the photograph of the scale with the evidence taken from the defendant being weighed. The defendant merely speculates on appeal that the specimen could have been contaminated because the State's exhibit shows that a portion of the evidence touched the surface of the scale used by police. The defendant argues, "One can only guess what substance or substances resided on top of that scale, but a reasonable conclusion is that it was not the first time that suspect methamphetamine had come into contact with it." Further, the defendant claims that the photograph depicts a scale that is "filthy."

¶ 37    This court, however, in viewing the photograph of the scale cannot determine that the scale is "filthy" and cannot assume it was contaminated with other methamphetamine that, upon contact, would have contaminated the methamphetamine taken from the defendant. Such a determination requires not only a leap in fact and scientific conclusion, evidence of which is not before this court, but also requires us to ignore the fact that the scale depicted in the photograph actually appears quite clean. Far from the defendant's assertion that "one look at the scale *** leads to only one logical conclusion—its visible grime rendered anything that came near its surface highly susceptible to contamination," the scale's surface appears clean and well maintained. While there is a small brown area on the scale that looks like it could potentially be rust, the drug sample that came into contact with the scale's surface is located on another portion of the scale and does not come into contact with the small brownish area, whether it be rust or something else. The defendant

14

has presented no evidence that the scale had lingering methamphetamine on its surface which, upon contact, would transfer to the defendant's sample in this matter, changing its character from a substance devoid of methamphetamine to one containing methamphetamine.

¶ 38    Having found that the State's evidence in this matter establishes a sufficiently complete chain of custody to show that the substance was in substantially the same condition when it was tested as when it was seized, and that the defendant has presented no evidence of the contamination alleged, we conclude that the trial court did not abuse its discretion when admitting the evidence. This is simply not one of the "rare instances" described in *Woods* in which there was a "complete breakdown in the chain of custody that would permit the defendant to overcome his forfeiture of this issue." There was no error and, thus, we honor the forfeiture.

¶ 39                                    B. Defendant's Admission

¶ 40    The defendant next asserts that the State violated his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to become aware of, and to disclose, an audio recording of the defendant's oral admission to possession of methamphetamine, given inside of Officer Chamness's squad car. See *id.* at 87 (under *Brady*, it is a violation of the right to due process for the State to fail to disclose evidence that is favorable to the accused and material either to guilt or to punishment). The defendant additionally claims that the State violated Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001), which governs discovery disclosures in criminal cases. The State counters that no *Brady* or discovery violation could flow from the defendant's claim that he was not provided with a copy of an audio recording of his own statement, where there is no evidence that such a recording existed. Further, the State argues that there could be no violation of Supreme Court Rule 412(a)(ii) where the statements of the defendant were disclosed in advance of trial.

15

¶ 41    Defense counsel made an oral motion to suppress before the trial court at the close of the State's evidence, and requested as a discovery sanction, that the trial court bar and strike testimony from the officers about the defendant's admission to possession of methamphetamine. The defendant's argument was that the State did not comply with his discovery request, where the admission "should have been recorded. And it was not." The party's arguments at the hearing focused on *People v. Kladis*, 2011 IL 110920, which was a case reviewing a discovery sanction, not conducting a *Brady* analysis. In his posttrial motion, the defendant stood on his motion, which argued simply that the trial court erred in denying his motion to suppress.

¶ 42    As the defendant's argument during his oral motion to suppress failed to raise a *Brady* violation, and his written posttrial motion similarly failed to do so, the defendant has waived this issue. See *People v. Walls*, 323 Ill. App. 3d 436, 462 (2001) (the well-settled general rules are that issues not raised both during trial and in a posttrial motion are effectively waived for purposes of review). Moreover, our supreme court has held that having specified the ground for his objection at trial, a defendant waives any alternative objections not specified. *People v. Steidl*, 142 Ill. 2d 204, 230 (1991).

¶ 43    We will now determine whether the trial court erred in determining that the State did not commit a discovery violation. Pursuant to Illinois Supreme Court Rule 412(a)(ii) (eff. Mar. 1, 2001), the State must disclose, upon written motion of defense counsel, "any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant." Possible sanctions a trial court may impose against a party that has failed to comply with an applicable discovery rule include forcing disclosure of the missing information, granting a continuance, excluding the evidence, or entering any other order the trial court deems just. Ill. S. Ct. R. 415(g)(i) (eff. Oct. 23, 2020). "[T]he purpose of the discovery rules is to protect the accused

16

against surprise, unfairness, and inadequate preparation." (Internal quotation marks omitted.) *People v. Hood*, 213 Ill. 2d 244, 258 (2004). The defendant carries the burden of showing surprise or prejudice. *People v. Heard*, 187 Ill. 2d 36, 63 (1999).

¶ 44    As an initial matter, we note that the parties disagree as to the applicable standard of review. The defendant claims that "it is undisputed that the evidence was inadvertently suppressed," and thus, the proper standard of review is *de novo*. See *People v. Lovejoy*, 235 Ill. 2d 97, 118 (2009) (where the facts giving rise to an alleged discovery violation are not in dispute, the issue is a matter of law, which is reviewed *de novo*). The State responds that the mere existence of an audio recording is in dispute, and thus, *de novo* review is inappropriate. We agree with the State that there is dispute as to whether the facts show an audio recording was created or inadvertently suppressed. As such, we will review the trial court's determination that there was no discovery violation for an abuse of discretion. See *People v. Kladis*, 2011 IL 110920, ¶ 39.

¶ 45    The defendant asserts that the only reasonable conclusion to infer from Officer Chamness's testimony is that Officer Chamness activated the audio recording system in his squad car, and it captured everything the defendant had said when he was inside the car. The defendant points to Officer Chamness's testimony that his squad car's audio recording system "should have been on" when the defendant made his admission to possessing methamphetamine, coupled with his testimony that "anytime we place someone in the vehicle, we always start a recording," in support of his assertion that there was an audio recording created. The defendant argues that the testimony leads to only one reasonable conclusion—that Officer Chamness activated the audio recording system in his squad car, and it captured whatever the defendant said inside the car. We cannot agree.

17

¶ 46    Other reasonable conclusions exist. For example, Officer Chamness may have failed to activate the recording device on this occasion. Officer Chamness may have taken the usual steps to activate the recording device, but it malfunctioned, failing to capture a recording. There are numerous possibilities that could explain why no audio recording came into the possession of the State; however, the defendant, as the appellant, bears the burden of providing a sufficiently complete record to support its claims of error. *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010). Any doubt arising from the incompleteness of the record will be construed against the defendant. *Id.* There is no evidence in the record that definitively indicates an audio recording ever existed. Further, the defendant carries the burden of showing surprise or prejudice. *Heard*, 187 Ill. 2d at 74. Here, the State provided the witnesses to and the content of the defendant's statement. Thus, he could not be surprised or prejudiced by the testimony regarding the statement.

¶ 47    Where the defendant cannot show that an item of evidence ever came into existence, we cannot determine that the State violated the discovery rules by failing to become aware of the same. Thus, we cannot find that the trial court abused its discretion in determining that no discovery violation occurred, where we cannot find by this record that an audio recording was ever made. See *People v. Strobel*, 2014 IL App (1st) 130300, ¶ 11 ("*Kladis* does not stand as authority for imposing a sanction against the prosecution where the requested discovery material never existed in the first instance.").

¶ 48                                    C. Excessive Sentence

¶ 49    The final issue the defendant raises on appeal is whether the trial court imposed an excessive sentence. The defendant argues that his nine-year sentence is excessive, where the trial court failed to consider the defendant's drug addiction and abusive childhood environment in mitigation. As a result, the defendant requests that this court exercise its authority under Illinois

18

Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), to reduce his sentence; or, alternatively, vacate the defendant's sentence and grant him a new sentencing hearing. The State responds that the trial court properly considered and weighed the evidence before it in fashioning a permissible sentence.

¶ 50 The defendant's contentions of error relate to the trial court's application of potentially mitigating evidence in fashioning a sentence. "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Reviewing courts afford great deference to the sentence imposed below because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider these factors than the reviewing court, which must rely on the cold record. *Id.* at 213. A sentence imposed within the applicable statutory sentencing range is presumed proper. *People v. Webster*, 2023 IL 128428, ¶ 21. We will not disturb a defendant's sentence absent an abuse of discretion by the trial court. *Alexander*, 239 Ill. 2d at 212. A sentence will be deemed an abuse of discretion where that sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Id.*

¶ 51 The defendant's claim of error as to sentencing is that the trial court failed to consider evidence of the defendant's history of childhood abuse and drug addiction. Such facts, however, are not statutory mitigating factors that the trial court was required to consider. See 730 ILCS 5/5-5-3.1(a) (West 2022). Rather, they are nonstatutory factors that the trial court had the discretion to consider. See *People v. Scott*, 363 Ill. App. 3d 884, 892 (2006) (noting a sentencing court *may* consider nonstatutory factors in crafting a sentence). Further, a sentencing court need not regard drug addiction or an abusive childhood as either aggravating or mitigating. *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 64.

¶ 52    Here, while the defendant alleges that the trial court did not consider the defendant's history of drug addiction and childhood abuse before imposing his sentence, we must note that the information was included in the defendant's PSI filed on May 25, 2022. The trial court specifically stated, "The Court will consider [the PSI], and I have read it." Although the trial court may not have specifically stated for the record every factor that it considered, "[w]hen mitigating factors are presented to the court, there is a presumption that the trial court considered them." *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998). We are unable to find that it was error for the trial court not to explicitly comment on these circumstances.

¶ 53    After reviewing the defendant's argument claiming that the trial court failed to consider certain mitigating factors, it becomes clear that he is asking this court to do precisely what it may not; reweigh the sentencing factors. Quite simply, this is not our role. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 37. The defendant's sentence fell within the sentencing range.

¶ 54    After having reviewed the evidence and the trial court's detailed findings at the defendant's sentencing hearing, we cannot find that the trial court's consideration of the evidence in aggravation and mitigation was not in accordance with the law. We must therefore conclude that the defendant's sentence was proper because it was neither greatly at variance with the spirit and purpose of the law nor manifestly disproportionate to the nature of the offense. See *People v. Martin*, 2012 IL App (1st) 093506, ¶ 47. Accordingly, the trial court did not abuse its discretion in sentencing the defendant.

¶ 55                                III. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the judgment of the trial court of Jefferson County.

¶ 57    Affirmed.